UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **WILLIE JENKINS** | **CIVIL ACTION NO. 04-1137** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **HOUSE OF RAEFORD FARMS OF LOUISIANA, LLC** | **MAG. JUDGE KAREN L. HAYES** |

**RULING**

Willie Jenkins brought this suit against his former employer, House of Raeford Farms of Louisiana, L.L.C. ("Raeford"), alleging disparate treatment based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

Pending before the Court is a Motion for Summary Judgment [Doc. No. 17], filed by Raeford. Jenkins has filed a Memorandum in Opposition to the Motion for Summary Judgment. Raeford has filed a Reply Brief, and Jenkins has filed a Supplemental Memorandum in Opposition. For the following reasons, Raeford's Motion for Summary Judgment is hereby GRANTED.

**I. FACTS AND PROCEDURAL HISTORY**

On April 18, 2003, Raeford hired Jenkins, a black male, as a laborer on a chicken-processing assembly line at its plant in Arcadia, Louisiana. Raeford assigned Jenkins to the night shift, from 11:30 p.m. to 8:00 a.m., where his job consisted of clipping the tips of chicken breasts with sharp scissors, often referred to as "clipping tenders," as the chickens passed by on the assembly line ("the line").

Workers on the line stand about one to two feet apart, and on both sides of the line, which is approximately three feet wide. Thus, at his normal position, Jenkins had co-workers working on both sides of him, as well as across the line.

Jenkins states that he was the only black man working on the line. Raeford employed just over 500 employees at its Arcadia facility in April of 2003. Of these employees, approximately 75% were

black, approximately 20% were Hispanic, and under 5% were non-minority. Some of the employees at Raeford spoke only Spanish, some were bi-lingual, and some, including Jenkins, spoke only English.

On May 19, 2003, Jenkins spent his entire shift working on a special project in a location different from his normal spot on the line. As was the normal procedure, another employee, Rolando Perez, took Jenkins's place in his absence.

On May 20, 2003, Jenkins reported back to his regular position on the line. Perez was now at a position diagonally and across the line from Jenkins. Lucas de la Cruz, another Hispanic employee, was working directly to the right of Jenkins. At some point during the shift, Jenkins complained to a supervisor about the way Perez and de la Cruz had been cutting the chickens. Jenkins later stated that they were intentionally "cutting it to mess [him] up on the line," such that he could not do his job properly.

Later that night, Perez and de la Cruz were speaking in Spanish to one another across the line. Jenkins stated that Perez was looking at him "all crazy like he wants to do something to me." Although Jenkins did not understand the conversation in Spanish, he explained that he understood Perez's meaning because "God give you instincts on things" and that "He gave instincts that the guy wanted my job, and he didn't want me there. He wanted to be over there with his drinking partners."

Jenkins then asked de la Cruz, who apparently spoke at least some English, to ask Perez what Jenkins had done to him. De la Cruz then spoke to Perez in Spanish. De la Cruz then touched Jenkins's side with his finger to get Jenkins's attention. According to Jenkins, De la Cruz then pointed to Perez and, with a knife in his hand, de la Cruz made a stabbing motion. Although Perez made no motion, Jenkins stated Perez was "looking at me all crazy, like, yes, I'm going to do it." Jenkins understood these gestures as indicating that Perez wanted to stab him.

Immediately after this incident, Jenkins informed the lead person on the line, who called the supervisor, Julio Hernandez. Hernandez, who was Hispanic and bilingual, immediately came to the

line, and Jenkins told him what had happened. Hernandez told Jenkins he would handle the situation and asked Jenkins what he wanted to do. Jenkins responded that he wanted to go home right then and pray about the situation with his wife. Hernandez granted Jenkins's request, and Jenkins left work.

The next night, May 21, 2003, Jenkins reported to work for his regular shift on the line. Upon arrival, however, Jenkins was asked to attend a meeting with Monica Young, the union representative; Larry Anders, the night-shift manager; Margaret Buchnan, the plant nurse; and Hernandez, in order to discuss the incident from the previous night. Jenkins explained at the meeting what had happened and stated that he felt threatened at work. At the meeting, Jenkins also stated that he kept money in his pocket in case he needed to get a gun to protect himself and that he could get a gun quickly if he needed one. Jenkins explained that, while he had contemplated bringing a gun to work, he had spoken to God and God told him not to bring a gun to work.

After the meeting, Jenkins was asked if he would work in a different area of the plant. Jenkins agreed, so Raeford moved Jenkins to the front line to feather chickens. Jenkins worked at the front line for about two or three hours fulfilling a special order that had come in, and then was moved to the evisceration section where he was insulated from other workers at the plant. However, Jenkins could not work in the evisceration section because it was much warmer and his glasses kept fogging over. Jenkins then asked a union representative if he could be moved to a different area, and the union representative relayed the request to Anders. Since no other positions were available that night, Anders told Jenkins to go home and report back the next night for a new position.

At the end of his shift that morning, Anders arranged a meeting with Carolyn Grossman, Raeford's human resource manager. Anders recounted to Grossman what had happened with Jenkins, including the incident with Perez and de la Cruz, Jenkins's complaint, and the meeting with Jenkins. Specifically, Anders told Grossman about Jenkins's statements that he had thought about bringing a gun to work, but that God had told him not to. Anders explained that, based on Jenkins's statements and

3

demeanor, he believed Jenkins posed a threat to other employees.

Grossman concluded that Jenkins should be discharged. Grossman contacted Jenkins at his home on the morning of May 22, 2003. She explained her decision and offered Jenkins the opportunity to resign, but Jenkins refused. Grossman discharged Jenkins effective May 22, 2003.

On February 2, 2004, Jenkins filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On March 4, 2004, the EEOC issued a dismissal and notice of right to sue.

On May 24, 2004, Jenkins filed the instant suit. On February 28, 2005, Raeford filed the pending Motion for Summary Judgment. On March 30, 2005, Jenkins filed an opposition memorandum. On April 11, 2005, Raeford filed a reply brief, and on April 18, 2005, Jenkins filed a supplemental opposition.

With full briefing by all parties completed, the Court is now prepared to rule on the Motion for Summary Judgment.

## II. LAW AND ANALYSIS

**A.  Motions for Summary Judgment**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record that highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.* The moving party cannot satisfy its initial burden

simply by setting forth conclusory statements that the nonmoving party has no evidence to prove its case. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise matter in which the evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B.     Title VII Analysis**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Jenkins alleges that he was "discriminated against based upon his race in that he was punished because he was threatened by a Hispanic employee of Raeford, and because Raeford had so many Hispanic employees, it chose to move Jenkins and constructively and retaliatorily discharge[1] Jenkins, an African American, instead of punishing the Hispanic employee who committed a felony against an African American." In other words, Jenkins claims disparate discipline based on race in that he, an African American, was discharged whereas Perez and de la Cruz, two Hispanics, were not.

A plaintiff can prove discriminatory animus by either direct or indirect evidence. *Russell v.*

---

[1] Although Jenkins states he was "retaliatorily discharged," this is not a claim of retaliation under Title VII. As Jenkins admits, he has "never suggested that he was retaliated against because of his reporting a Title VII claim."

5

*McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). In the present case, Jenkins has offered no direct evidence of discrimination. When there is no direct evidence of race discrimination, the Court applies the familiar burden-shifting scheme of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), as recently modified by the Fifth Circuit:

> Under . . . the modified [*McDonnell Douglas*] approach: the plaintiff must . . . demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its [adverse employment decision]; and, if the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).'". . . If a plaintiff demonstrates that [a discriminatory factor] was a motivating factor in the employment decision, it then falls to the defendant to prove "that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, plaintiff prevails."

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (internal citations omitted). Although this burden shifting scheme shifts the burden of *production* to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

Whether summary judgment is appropriate in any particular case depends on a variety of factors, including "the strength of the *prima facie* case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case and that properly may be considered." *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606 (5th Cir. 2001). "[A]n employer would be entitled to summary judgment "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred.'" *Id.* (internal citations omitted).

1. **Prima Facie Case**

To establish a *prima facie* case of race discrimination under a disparate treatment theory, Jenkins must show that (1) he is a member of a protected class; (2) he was qualified for his position;

(3) he was subjected to an adverse employment action; and (4) others similarly situated were treated more favorably. *See Okoye v. The Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 4040 (5th Cir. 1999).

The Court is persuaded that Jenkins clearly satisfies the first three prongs of his *prima facie* case. It is indisputable that Jenkins, a black man, belongs to a protected group and that his termination by Raeford constitutes an adverse employment action taken against him. Similarly, there has been nothing to suggest that Jenkins was unqualified for his job.[2]

The Court's analysis focuses on the fourth prong in the *prima facie* case, that others similarly situated were treated more favorably than the Plaintiff. "[I]n order to establish a prima facie case based on disparate discipline, a plaintiff must point to evidence of employees disciplined less harshly 'under circumstances nearly identical'" to that of the plaintiff. *Dismuke v. City of Indianola*, No. 01-60475, 2002 WL 334618, at *2, n.6 (5th Cir. Feb. 11, 2002) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995). In other words, Jenkins must show that "the misconduct for which [he] was discharged was nearly identical to that engaged in" by other employees who were treated more favorably. *Okoye*, 245 f.3d at 514; *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990).

Jenkins argues that he was similarly situated to Perez and de la Cruz in that they also made veiled threats of violence by implying they were going to stab him, but that these two Hispanics were not discharged for their threats. Jenkins contends that "[t]hey all worked at the same place and the same station. Two of them wanted to get rid of the other one. They were involved in the same event. If Jenkins had responded violently, there would have been grounds to punish both of them equally. The

---

[2]The Court recognizes that Jenkins at this point has the burden of production in showing that he *was* qualified for the job. Moreover, it should be noted that Jenkins had only been working at Raeford for just over a month and was still in his probationary period when he was discharged. Nonetheless, since Raeford has not suggested otherwise, and since the burden of showing qualification at the *prima facie* stage is minimal, *see, e.g., Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1505-06 (5th Cir. 1988), the Court is willing to assume–for this *prima facie* analysis only–that Jenkins was qualified to perform his job.

7

Hispanics attacked the African-American, and the Hispanic supervisor who got called in to investigate the incident managed to get the defendant to get rid of Jenkins."

In response, Raeford argues that "a Grand-Canyon size gap exists between Perez's and de la Cruz's alleged hand motions (which they denied to be a threat), compared to Jenkins's sworn admission that he in fact threatened to bring a gun to work, a threat believed by Anders and Grossman." Raeford points out that Hernandez, a supervisor at the plant, and Anders, the night-shift manager, both investigated Jenkins's allegations and that both concluded that Perez and de la Cruz did not in fact threaten Jenkins. Thus, Raeford's management found no reason to discharge or otherwise discipline Perez or de la Cruz. In contrast, Raeford argues, Grossman made the decision to discharge Jenkins based upon Jenkins's statements about bringing a gun to work, which were made in front of several plant supervisors and in a manner that those who witnessed the statements believed constituted a realistic threat to the safety of employees at the plant.

The Court maintains doubt that the conduct of Jenkins and the two Hispanic men were in fact "nearly identical," as required by Fifth Circuit case law. Nonetheless, a plaintiff "need only make a very minimal showing" in order to establish a *prima facie* case of discrimination. *See Nichols v. Loral Vought Systems Corp*, 81 F.3d 38, 41 (5th Cir. 1996). Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Jenkins has satisfied his minimal burden of production at this stage by showing that others who were similarly situated were treated more favorably.

### 2. Legitimate Nondiscriminatory Reason

Once the plaintiff has established a *prima facie* case of unlawful discrimination, a presumption of discrimination arises and the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged employment action. *Hicks*, 509 U.S. at 506. "The defendant may meet this burden by presenting evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'"

*Nichols*, 81 F.3d at 41 (internal citations omitted).

Raeford offers the following reasons for the discharge of Jenkins, as specifically articulated in the affidavit of its human resources manager, Carolyn Grossman: "(1) Jenkins's threat to bring a gun to work constituted a threat to the welfare and safety of House of Raeford employees; (2) Jenkins's fear of his Hispanic co-workers and threat to bring a gun to work amounted to irrational and out-of-control paranoia, especially considering that Jenkins stated that he talked to God about whether to bring a gun to work; and (3) Jenkins had not completed his first 60 days of employment, and was still a probationary employee who could be fired without cause."

Based on the evidence before it, Raeford's management reasonably concluded that Jenkins's comments and conduct at the May 21, 2003 meeting constituted a threat of workplace violence, a conclusion which, if believed, clearly constitutes a legitimate, nondiscriminatory reason for an employee's discharge. *See, e.g., Smith v. Leggett*, 220 F.3d 752, 759 (6th Cir. 2000) (finding plaintiff's threat to "blow away some MFers" constituted a legitimate, nondiscriminatory reason for firing him, and listing other courts' finding of threats of workplace violence to be a legitimate, nondiscriminatory reason for discharge).

### 3. Pretext

Since Raeford has articulated a legitimate, nondiscriminatory reason for terminating Jenkins's employment, the inference of discrimination created by plaintiff's *prima facie* case drops out and the burden shifts back to the plaintiff to show intentional discrimination. *See Hicks*, 509 U.S. at 510-11. In order to meet this burden of persuasion, Jenkins must offer sufficient evidence that Raeford's articulated explanation is a pretext for discrimination.[3] *See Rachid*, 376 F.3d at 312.

---

[3] Jenkins has not alleged that this is a mixed motive case. Accordingly, the Court need not consider whether the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), or the Fifth Circuit's decision in *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir.2004), affects the analysis. *See Septimus v. University of Houston*,

In order to establish pretext, the plaintiff must demonstrate that the defendant's proffered reason is not true, but instead is a pretext for intentional discrimination. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The Fifth Circuit has repeatedly made clear that on summary judgment "the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Id*. "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Auguster v. Vermillion Parish School Bd.*, 249 F.3d 400, 403 (5th Cir. 2001) (internal citations omitted). "[A]n employee's subjective belief of discrimination alone, however genuine, is not sufficient to warrant judicial relief." *Id*.

In the present case, Jenkins offers several arguments that purportedly "establish that calling Jenkins a threat was a pretext to get rid of him instead of the people who threatened Jenkins."

First, Jenkins argues that Raeford's stated reason for discharging him must be pretextual because, if he truly constituted such a threat to other employees, Raeford would not have allowed him to return to work after the meeting or instructed him to come back to work the next day. However, in making this argument, Jenkins omits the fact that, immediately after the meeting, he was moved to a different area of the plant for a temporary assignment, where he would not come into contact with Perez and de la Cruz. Then, shortly after, he was moved to the evisceration area of the plant, where he was insulated from all other workers entirely. After Jenkins complained that he could not work in this area because his glasses fogged over, Anders told Jenkins there was no other position open and that he should go home and report back to work the next day. The decision to discharge Jenkins was made only after Anders concluded there was nowhere for Jenkins to work in isolation, and only after Anders consulted with the human resources manager to discuss his concerns

---

399 F.3d 601, 607 n.7 (5th Cir. 2005).

about Jenkins. The Court finds that, contrary to Jenkins's assertion, the fact that Raeford attempted to remedy the situation by permitting Jenkins to work his shift in an area away from other coworkers–most importantly away from Perez and de la Cruz–and the fact that Raeford did not fire Jenkins until Anders met with the human resources manager do not give rise to an inference of pretext.[4]

Jenkins next argues that Raeford's proffered reason was a pretext because "the decision to fire Jenkins came from someone who had not participated in the pertinent discussion." Jenkins states that "because Grossman did not hear the statements that allegedly gave legitimacy to the disparate discipline of Jenkins, Grossman must claim she determined Jenkins to be a threat based on Anderson's [sic] determination of same. Anders's certifying Jenkins as a threat, however, is ridiculous because he asked Jenkins to return to work the next day."

Jenkins's argument is without merit. There is absolutely no legal authority that a decision maker must witness an event firsthand before making an employment decision. The fact that Grossman made a decision based on Anders's report of Plaintiff's statements, which were made at a company meeting attended by several other high-level Raeford employees, does not demonstrate pretext. Additionally, as previously discussed, the fact that Anders chose to consult with the human resources manager rather than making a rash decision to terminate Jenkins does not in any way refute the truthfulness of Raeford's justification for its decision.

Next, Jenkins argues that "Grossman fired Jenkins because he feared Perez and de la Cruz," that "Grossman fired Jenkins because he could not speak the language of Perez and de la Cruz," and

---

[4] It is also noteworthy that Jenkins stated at the May 21, 2003 meeting that he kept money in his pocket in case he needed to get a gun, not that he was already in possession of one. Thus, it would not be illogical for Raeford to conclude that Jenkins posed more of a serious threat in the future than during the shift immediately following the meeting.

11

that Hernandez "apparently sided with his own and gave Jenkins's job to de la Cruz permanently." Jenkins presents absolutely no evidentiary support for any of these assertions, only his own suspicions and subjective beliefs. The Fifth Circuit has repeatedly held that "[n]either 'unsubstantiated assertions' nor 'conclusory allegations' can satisfy the non-moving party's burden" that the proffered reasons are not true or that the defendant discriminated on the basis of race. *See, e.g., Lawrence v. Univ. of Texas Med. Branch*, 163 F.3d 309, 312 (5th Cir. 1999); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Auguster*, 249 F.3d at 403. Therefore, Jenkins's unsubstantiated and conclusory allegations do not establish pretext.

Finally, Jenkins argues that Raeford's proffered nondiscriminatory reason is pretextual because "[t]he only threatening thing Jenkins is alleged to have done was to say that he was so scared that the thought of bringing a gun entered his mind, but God told him that would be foolish. Jenkins never acted in a threatening way, nor did he react in kind or violently when he thought his life was threatened." Similarly, Jenkins argues that Raeford's belief that Jenkins was paranoid and irrational should be given no weight because "[t]here is no allegation that Grossman could make this determination or that anyone except those who were acting against Jenkins was consulted regarding Jenkins's mental state." These arguments may demonstrate that Raeford overreacted in discharging Jenkins or perhaps even erred in assessing the potential of the risk posed, but they do not establish pretext, for "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry*, 55 F.3d at 1091. "While the matter could have been handled differently, it is not the court's place to second-guess management's business decisions or to serve as a self-appointed, corporate personnel manager." *Patton v. United Parcel Services, Inc.* 910 F.Supp. 1250, 1267 (S.D. Tex. 1995) (citing *Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1165 (5th Cir. 1993)). "Furthermore, Title VII does not make an employer liable for simply erroneous or arbitrary decisions." *Id*. This argument is therefore without merit.

The Court finds that Jenkins has not established a genuine issue of material fact that Raeford's stated rationale for its adverse employment decision was based on pretext.

### III. CONCLUSION

For the foregoing reasons, Raeford's Motion for Summary Judgment [Doc. No. 17] is hereby GRANTED, and the lawsuit is DISMISSED WITH PREJUDICE, each party to bear its own costs.

MONROE, LOUISIANA, this 11th day of July, 2005.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE